John G. Balestriere*
Roberto Cuan (Atty ID: 035821999)
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:     (212) 208-2613
john.balestriere@balestrierefariello.com
roberto.cuan@balestrierefariello.com
*Attorneys for Plaintiff and the Class*
*\*Pro hac vice application forthcoming*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **DOYLE C. STONE**, individually, and for all others similarly situated,<br><br>                   Plaintiff,<br><br>     -against–<br><br>**PRUDENTIAL FINANCIAL, INC.,**<br>**PRUCO LIFE INSURANCE COMPANY**,<br><br>               Defendants. | Case No.: _____<br><br><br>**COMPLAINT – CLASS ACTION**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Doyle C. Stone ("Plaintiff" or "Stone"), on behalf of himself and a class of similarly situated individuals, by his attorneys, Balestriere Fariello, for their Complaint against Prudential Financial, Inc. ("Prudential") and Pruco Life Insurance Company ("Pruco"), respectfully allege as follows upon information and belief, except as to allegations concerning Plaintiff, which are made upon personal knowledge, and except as otherwise indicated herein.

## INTRODUCTION

1.      For years Prudential has engaged in a scheme to deprive individual participants' and their beneficiaries' retirement, annuity, and insurance plans (the "Plans") of money entrusted to Prudential's care. Prudential knowingly utilizes deficient notification and identification practices, along with purposefully unclear descriptions of benefits, so that less than the full amount of funds due are distributed to Plan participants and their beneficiaries.

2.      In furtherance of this scheme, Prudential uses sophisticated software to obfuscate important plan information in order to render required notices less effective and to more easily misappropriate individual Plan participants' monies.

3.      To hide this scheme from regulators, Prudential developed an esoteric database and software to enable it to manipulate the data and information it was required to provide in regulatory audits.

4.      As a result of its failure to provide effective, actual notice, Prudential amasses millions of dollars from many thousands of Plans in either of two ways.

5.      First, Prudential, by failing to identify beneficiaries, improperly releases reserve funds and transfers the unclaimed monies of supposedly abandoned Plans into its own accounts, instead of transferring these funds to state unclaimed property accounts, as required by law, where the funds could be reclaimed by the beneficiaries.

6.      Or, second, Prudential, by failing to alert individual participants of changes to their policies, deals the benefit proceeds of the Plans in its own interest. Prudential achieves this by restricting participants or beneficiaries the benefits it owes, lending itself

the benefits it owes, investing the retained funds for its own account, and keeping for itself the resulting profits.

7.     Prudential's misconduct often affects longstanding and retired individual Plan participants of the Plans, many of whom are seniors, including those in nursing homes and other care facilities, which adds to the well-recognized and growing problem of financial elder abuse.

8.     Prudential is fully aware of its misconduct. In 2012, Prudential and its independent life insurance companies reached a $17 million multi-state settlement (the "Regulatory Settlement Agreement") for similar misconduct. Prudential was found to have inadequately determined and notified life insurance beneficiaries that had a claim on the funds entrusted to Prudential's care.[1]

9.     More recently, Prudential management discussed with its staff the Company's own deficient notice practices that were virtually identical to those for which its competitor, MetLife, Inc. ("MetLife"), had self-reported to the Securities and Exchange Commission ("SEC") in 2019 and been fined millions of dollars by regulatory agencies.[2]

10.    Prudential owed Plaintiff, at a minimum, the fiduciary duties of loyalty and due care to administer the benefit Plan primarily in his interest.

---

[1] *See, e.g.,* Regulatory Settlement Agreement, https://doi.sc.gov/DocumentCenter/View/7456/Pru-DENTIAL_022012 (last accessed January 28, 2021).
[2] *See, e.g.,* Press Release, Securities and Exchange Commission, MetLife to Pay $10 Million for Longstanding Internal Control Failures (Dec. 18, 2019), https://www.sec.gov/news/press-release/2019-269 (last accessed January 28, 2021).

11. Prudential shirked these duties, acting contrary to the care, skill, prudence, and diligence that a fiduciary in a similar capacity would exercise under similar circumstances and in a way that benefited Prudential but hurt its fiduciaries.

12. Plaintiff brings this action on behalf of himself and the Class, as defined below, under the New Jersey Consumer Fraud Act, 56:8-1 *et seq.* (the "CFA") and common law claims, seeking a remedy for Prudential's practice of converting Plan proceeds and investing these funds for its own account.

13. Prudential acquires possession of Plan funds in the course of its fiduciary service and retains the profit flowing from the investments of the wrongfully retained funds. Prudential's conduct violates the CFA and common law standards because it is a party in interest and a fiduciary. Prudential's misconduct described herein violates the duties of loyalty and prudence which common law imposes upon fiduciaries.

14. Plaintiff and the Class have suffered significant damage due to Prudential's misconduct and are, at minimum, entitled to the benefits owed to them under their insurance and retirement plans, plus interest, along with any other relief the Court deems necessary and proper.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

16. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

4

17.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states other than the state in which Prudential is headquartered. 28 U.S.C. § 1332(d)(2)(A).

18.     Venue lies in the District of New Jersey because Prudential is incorporated under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey.  Prudential plans are administered in and Prudential can be found operating in the District of New Jersey.

## THE PARTIES

### *Plaintiff*

19.     Plaintiff Doyle C. Stone resides in Kentucky. At all relevant times, Plaintiff Stone has been a plan participant.

### *Defendants*

20.     Defendant Prudential is an American and global Fortune 500 company that is incorporated under the laws of New Jersey. Prudential is headquartered at 745 Broad Street, Newark, New Jersey.

21.     Defendant Pruco is a wholly owned subsidiary and is controlled by Prudential. Pruco is incorporated under the laws of Arizona and maintains its principal office at 213 Washington Street, Newark, New Jersey.

22.     Prudential, along with its subsidiaries, provides a variety of products and services to both individual and institutional customers, including life and supplemental insurance, annuities, retirement-related services, investment management, and mutual funds. Prudential operates in all fifty states and the District of Columbia, as well as in over forty other countries in Asia, Europe, and Latin America.

23.     Prudential's retirement business provides retirement investment and income products and services to retirement plan sponsors in the public, private, and non-profit sectors.

## FACTUAL ALLEGATIONS

### The Affected Plans

24.     The business lines and products at issue in this litigation, the Plans, are retirement plans, annuity plans, and insurance plans (life and supplemental) that Prudential sells either directly or through its insurance agents to private individuals.

25.     In these policies, Prudential takes on responsibility for administering the Plans and distributing proceeds to Plan participants and their beneficiaries.

26.     For all Class members, Prudential is a "named fiduciary."

27.     Under its policy contracts, Prudential is the administrator of the Plans because the company exercises discretionary authority or control with respect to management of the benefit Plans and has discretionary authority and responsibility in the administration of the benefit Plans.

28.     Specifically, under the terms of the benefit Plans, Prudential has the responsibility to maintain participant information and reserve funds, as well as administering benefit communications and distributions.

29.     By virtue of these responsibilities, Prudential has the fiduciary duty to diligently monitor and loyally administer participant accounts.

## Prudential's Administration of the Plans

30.     Prudential promises to act like a fiduciary. For example, payment clauses in relevant policies provide: "If your account becomes dormant, you will be mailed a check for the remaining balance plus interest, at your last address shown on our records. If you do not timely cash that check, your funds will be transferred to the state as unclaimed property. If your funds are transferred to the state, you may claim those funds from the state . . ."

31.     But Prudential does not do this. Instead, Prudential employs inadequate procedures in Plan benefits distribution, which has resulted in its failure to pay Plan participants and improperly increasing its profits.

32.     As the Plan administrator, Prudential has fiduciary duties to inform Plan participants or their beneficiaries that certain events have made them eligible to receive distributions from the Plans.

## Plan Notice Requirements

*Retirement Plans*

33.     For retirement Plans, Prudential is required to give notice to Plan participants when they are eligible to start receiving their retirement benefits, usually at age 65.

34.     It is Prudential's intentional practice to mail notices only twice to the last known address of the participant, once at age 65, and the second five years later. Prudential does not take any further steps to ensure that Plan participants actually receive effective notice.

35.     This two-mailing practice was found to be inadequate by the SEC and a violation of MetLife's fiduciary duties in its self-report to regulators and the regulatory settlements MetLife entered into.

36.     Prudential management has knowledge of these events and even discussed internally that it had a "MetLife problem" itself.

*Annuity Plans*

37.     Similarly, with respect to annuity Plans, Prudential again limits its notice to Plan participants that their annuities have matured and they are eligible for distributions to a notice mailed upon maturity and a second notice mailed five years later.

*Life and Supplemental Life Insurance Plans*

38.     Finally, with respect to life and supplemental life insurance Plans, when Plans are transferred to Prudential as a new administrator, participants are entitled to withdraw the funds from their insurance and transfer the insurance to a different administrator instead of Prudential.

39.     If the participant does not respond within the time limits applicable under state regulations (usually 30 or 45 days), the funds stay with Prudential and the coverage is forfeited by the participant.

40.     Prudential sends a single, mailed notice to Plan participants.

41.     If Prudential does not receive a response from its mailings, it releases the Plan funds into Prudential's own accounts, contrary to its promises, its fiduciary duties, and legal requirements.

**Prudential's Failure to Provide Effective, Actual Notice**

42.     In giving notice to Plan participants of their eligibility to receive Plan fund distributions, Prudential has conflicting interests. It has a fiduciary duty to loyally and diligently give notice to the Plan participants. However, doing so may result in Prudential having to release and payout the funds in its possession. Ineffective or non-existent noticing practices allow Prudential to retain Plan funds for its own benefit.

43.     Prudential is disincentivized from mailing letters that have a good chance of being opened, read, and acted upon by Plan participants because when customers file claims against their policies, the monies in Prudential's reserves are expended and it can no longer misappropriate those funds for its own gain.

9

44.     In addition, Prudential designs the notices it sends out to look like junk mail in order to make it less likely that Plan participants will open, read and understand these notices.

45.     For example, Prudential typically sends a nondescript letter containing three-page notice in eight-point font explaining in unclear terms Plan participants' rights to funds. Prudential intentionally uses wording to describe benefits and customer options that is difficult for a layperson to decipher and obscures the fact that the recipient is entitled to receive funds.

46.     Prudential mails no more than two mailings to the last known address in its files but does not take any other readily available and reasonable action to locate Plan participants and ensure that they receive effective, actual notice.

47.     When mailings are returned as addressee unknown or moved, Prudential does not follow up on the returned mail to actually locate the Plan participants. Prudential does not even take the most basic steps to find its fiduciaries.

48.     For example, it does not routinely consult the Social Security Death Master File ("DMF") to determine if Plan participants have died, nor does it try to find participants by e-mail, telephone, a Google search, or by public records searches.

49.     The DMF, which collects death reports from family members, funeral homes, financial institutions, postal authorities, states and other federal agencies, would allow Prudential to search social security numbers, names, and date of births to determine the status of Plan participants.

50.     Prudential declines to use these readily available means of finding Plan participants even though the 2012 Regulatory Settlement Agreement requires Prudential to consult the DMF for individual life insurance beneficiaries. However, Prudential does not use the same diligence for the group Plans it administers.

**Prudential Works to Make Its Notices Less Effective**

51.     Prudential takes other affirmative steps to mislead Plan participants as to the actual terms of the notices.

52.     With respect to insurance Plan participants and beneficiaries, Prudential's misconduct includes Prudential's known—and uncorrected—faulty mailing of insurance packages to policyholders.

53.     Prudential's routine practices effectively causes thousands of insurance policyholders to default on their policies and lose the ability to transfer their policies or claim the cash value that is rightfully theirs.

54.     Prudential's negligence and willful malfeasance includes, but is not limited to, backdating correspondence to policyholders, which affects their ability (within Prudential's 30- or 45-day limit on policy transfers or claims) to opt into insurance transfers or opt to cash out.

55.     Prudential employs a third-party plan administrator and vendor to assemble mailings to policyholders, and there is ample evidence of repeated delays and inaccuracy issues with the vendor they use. This issue has gone uncorrected by Prudential.

56.     Documentary evidence demonstrates that the send date on correspondence to Prudential transferred-insurance policyholders is often effectively back-dated because Prudential's third-party external mailers and administrators let the packages sit in their mailrooms for ten to fifteen days.

57.     Moreover, Prudential does not clearly inform Plan participants that there is a payable cash value associated with their accounts. Prudential's insurance transfer mailings do not adequately inform policyholders of a cash redemption value associated with certain policies. This fact is often omitted from the correspondence sent to Plan participants or is willfully and deceptively buried in obscure fine print, which the average person would not know constitutes an option to take the cash value of their Plans (because they are unaware a cash value exists for their insurance policy) instead of transferring the insurance to Prudential.

58.     Further, Prudential often disavows any fault for the notice delay. Prudential informs both would-be transferred insurance policyholders and their beneficiaries to file claims against FedEx, UPS, other Prudential-contracted mail services, or the future plan administrator (selected by their new employer or the new custodian).

59.     In this manner, Prudential seeks to abrogate its own fiduciary responsibility to ensure that the benefits are paid to the entitled insurance beneficiaries.

60.     In addition, in or around December 2017, Prudential's Internal Audit Department began hiring Subject Matter Experts ("SME") from other departments. These SMEs oversee existing marketing materials and contracts and draft, structure, and compile the language for future or supplemental marketing collateral, associated

documents and contracts.

61.    SMEs design required notices to policyholders that look like "junk mail" and fail to disclose required information such as the "respond by date" to disburse funds.

### PRUDENTIAL'S MISHANDLING OF PLAINTIFF'S POLICY

62.     Stone's group annuity contract states that the maintenance fee on his policy amounts to "[l]esser of $35 or 2% of unadjusted account value at the time the fee is due is less than $100,000" and that Prudential reserves "the right to: (1) increase the maintenance fee, but it will not exceed $50 per annuity year, and (2) change the amount over which we will waive the maintenance fee."

63.    Prudential, however, lends itself the benefits it owes to Stone, to invest, and siphons off of the investment returns, in addition to the maintenance fee stated in Doyle's contract.

### PRUDENTIAL LENDS ITSELF PLAN BENEFITS

64.    When Prudential approves claims for death and retirement benefits under these Plans in amounts that exceed a certain threshold, Prudential does not pay the benefits in one sum or give the beneficiaries any choice concerning the mode of payment.

65.    Instead, Prudential issues Plan participants or beneficiaries a book of blank drafts that they can use to draw on the funds in increments. By doing so, Prudential exercises its control over the plan benefits and loans these benefits to itself, holding the participants or beneficiaries' benefits in its general account.

66.     When Prudential loans the Plan benefits to itself, it holds these borrowed funds in its general account until it is called upon to transfer funds to cover the drafts drawn on the debts it owes to the Plan participants or beneficiaries.

67.     In the interim, Prudential invests the Plan participants or beneficiaries' funds and keeps for itself the spread between the amount it gains by investing the beneficiaries' funds, which is in addition to the commission it collects and reports on quarterly and annual statements.

68.      Prudential does not disclose to its Plan participants or beneficiaries the amount of profit it realizes from its investment of funds that it owes plan participants or beneficiaries, nor does it negotiate in advance as to the amount of profit that it will retain.

**PRUDENTIAL HAS KNOWLEDGE OF ITS UNLAWFUL CONDUCT**

69.     In 2012, Prudential and its entities entered into the Regulatory Settlement Agreement with at least twenty states to correct similar wrongdoings in its life insurance businesses.

70.     The multi-state investigation examined Prudential's policies and procedures to ensure that life insurance and endowment policies were timely reported or remitted in accordance with Unclaimed Property and Insurance Laws in each state.

71.     The multi-state investigation found that Prudential was not doing enough to locate individuals due benefit payments. Furthermore, Prudential was not turning over unclaimed benefit payments either to beneficiaries or the states, as required.

72.     As a result of the investigation's findings, and to settle the claims of the state regulators over Prudential's improper practices, Prudential agreed to compare its in-force policies, annuity contracts, and retained asset accounts, as well as those policies that have lapsed and that are still within the applicable state dormancy period, against the DMF.

73.     Prudential also agreed to conduct thorough searches for the policyholder and beneficiary outside of the DMF, including, but not limited to, at least three mailing attempts, using online search tools, and contacting beneficiaries by phone and by email.

74.     Prudential's past practices, the multi-state investigation, and the Regulatory Settlement Agreement demonstrate Prudential's actual knowledge of its perfunctory efforts to locate Plan participants or beneficiaries are inadequate and improper.

## THE SEC HAS FOUND ANALOGOUS CONDUCT
## A VIOLATION OF FEDERAL LAW

75.     More recently, in 2019, the SEC found MetLife's similar conduct of releasing reserves for annuity benefits, after only two mailing attempts, to be improper and a violation of federal securities law.

76.     MetLife, which failed to properly pay workers' pensions, has paid more than $30 million in fines to federal and state agencies and more than $400 million to policyholders over its similar longstanding internal controls failures.

77.     For 25 years, MetLife presumed annuitants had died or otherwise would never be found if they did not respond to two mailing attempts made approximately five and a half years apart.

78.     MetLife, other than sending out two form letters, generally did not attempt to reach annuitants through any other means, such as by Certified Mail, e-mail, by telephone, or by contacting relatives or designated beneficiaries. Thus, if MetLife's contact information was inaccurate or incomplete, annuitants may have never received any notification from the company that they were entitled to benefits.

79.     MetLife's own Pilot Program was designed to test the efficacy of their outreach procedures and concluded that MetLife's process for locating and contacting missing annuitants was insufficient to justify the release of reserves.

80.     State and federal regulators concluded that MetLife's analogous conduct was a violation of various laws.

81.     Similarly, Prudential's limiting its efforts to two attempts to contact Plan participants are unlawful.

## PRUDENTIAL WORKS TO HIDE ITS MISCONDUCT FROM ITS REGULATORS

82.     Prudential management today is aware that its earlier, similar conduct was found to be improper in at least twenty states, and it is also aware that industry competitor MetLife has been penalized for analogous issues.

83.     In 2018, the General Vice President of Corporate, Operations, Risk, Technology stated that Prudential "has the same problem as MetLife," which inadequately searched and notified beneficiaries and improperly released reserve funds.

84.     Various Internal Audit Department reports show that Prudential was aware of its deficient mailing practices since at least 2010.

85.     Instead of taking steps to rectify its policies and procedures, Prudential management has hidden and destroyed evidence regarding the impact of its misleading statements using its Data Analytics Resource Center ("DARC") so that it may continue its misconduct.

86.     The DARC, at the direction of Prudential Directors and Vice Presidents from the Internal Audit department, employs sophisticated software to manipulate and obscure plan and beneficiary data in the event a regular or third-party auditor seeks reports. The manipulation falsely limits the extent of returned mail and non-responses from Plan participants so that the effects of its scheme are not evident to such auditors and regulators.

### PRUDENTIAL FAILS TO RELEASE PENSION AND LIFE INSURANCE FUNDS TO STATE UNCLAIMED PROPERY ACCOUNTS

87.     Prudential does not simply employ means to contact its fiduciaries which it knows are often doomed to fail.

88.     Prudential represents to Plan participants that if it fails to contact its fiduciaries, it has procedures in place to ensure payment of valid claims to the appropriate states in accordance with state unclaimed property laws.

89.     New Jersey's laws on unclaimed property require companies like Prudential to remit unclaimed plan payments to the state's Treasury.[3]

90.     Once the funds are received, the Unclaimed Property Administrator acts as a custodian until the funds are returned to the Plan participants.

91.     The purpose of unclaimed property laws is to protect the public by ensuring money owed to Plan participants is returned to them, rather than remaining permanently with financial institutions like Prudential.

92.     But Prudential, after it takes steps to hide its misconduct from regulators, takes the money which belongs to such fiduciaries for itself. Prudential management considers this to be "found money."

93.     When Prudential does not take the fiduciaries' funds for itself, it replaces the terminated policies with newer policies that generate higher fees and commissions.

94.     Taking the fiduciaries' funds for itself or replacing less lucrative policies with policies that charge higher premiums is a great boon to Prudential, as most insurance companies generate revenue in two ways: by charging premiums in exchange for insurance coverage, or then reinvesting those premiums into other interest-generating assets.

95.     By failing to release pension and life insurance funds to state unclaimed property accounts, Prudential is in violation of relevant law, its fiduciary duty, and its promises to its plan beneficiaries.

---

[3] *See, e.g.,* N.J.S.A. 46:30B-1.

## CLASS ACTION ALLEGATIONS

96.     Plaintiff brings the Claims for Relief as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b), on behalf of all persons in the United States who were (1) Plan participants in the transferred group retirement, annuity, and insurance Plans in or after January 2015 until the present date ("the Class Period"), and were impacted by Prudential's deficient notification practices and improper transfer of funds to its own accounts and (2) the beneficiaries of such Plans (hereinafter "Class").

97.     This action meets the following prerequisites of Rule 23(a):

a.   **Numerosity**: The Class includes hundreds, if not thousands, of members. Due to the high number of class members, joinder of all members is impracticable and, indeed, virtually impossible.

b.   **Ascertainable**: The proposed Class is ascertainable. Every policyholder, or their beneficiary, whose Plans transferred to or was administered by Prudential in the Class Period is ascertainable through Prudential's records and therefore the Class members are ascertainable.

c.   **Commonality**: A substantial pool of common questions of law and fact exists among the Class, including but not limited to:

i.   Whether Prudential adequately and diligently attempted to locate and contact Plan participants or their beneficiaries before releasing their accounts.

ii.  Whether Prudential checked the DMF before releasing benefits funds and closing accounts.

19

iii.  Whether Prudential transferred the unclaimed benefits from dormant accounts to state unclaimed property funds or to its own accounts.

iv.  Whether Prudential breached its fiduciary duties to Plan participants and beneficiaries by failing to use adequate location, contact, and confirmation procedures when searching for non-responsive Plan participants and beneficiaries.

v.  Whether Prudential breached its fiduciary duties to Plan participants by using SMEs to bury critical plan and benefit information in intentionally difficult-to-understand language and intentionally difficult to find locations within Prudential's informational pamphlets mailed to Plan participants.

vi.  Whether Prudential used DARC to manipulate and obscure Plan and beneficiary data from regulators or auditors.

vii.  Whether Prudential's ineffective mailing practices caused Plan participants to experience plan default.

viii.  Whether Prudential was negligent in failing to rectify its ineffective mailing practices.

ix.  Whether Prudential used ineffective notices to lend itself the benefits it owed to Plan participants and their beneficiaries, investing the retained funds for its own account, and keep for itself the resulting profits.

20

x. Whether Class Members suffered damages due to Prudential's breach of fiduciary duties owed to Class Members.

xi. Whether Class Members are entitled to the benefits owed them under their Prudential plans.

d. **Typicality**: Plaintiff's claims are typical of the claims of the Class. As an ordinary and individual Plan participant, along with all Class Members, Plaintiff has been injured by the same wrongdoing and practices of Prudential. Plaintiff's type and extent of injury is representative of the Class.

e. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class.   Plaintiff does not have any interests that conflict with the interests of the members of the Class. Plaintiff has engaged competent counsel who is experienced in complex litigation.

f. **Superiority**: A class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein. A class action will permit numerous similarly situated individuals to prosecute their common claims in a single forum simultaneously without duplication of evidence, expense, and resources. This action will result in uniformity of decisions and avoid risk of inconsistency and incompatible standards of conduct in the judicial system.

g. **Maintainability:** This action is properly maintainable as a class action for the above-mentioned reasons and under Rule 23(b):

i.   The individual amount of restitution involved is often so insubstantial that the individual remedies are impracticable and individual litigation too costly;

ii.   Individual actions would create a risk of inconsistent results and duplicative litigation;

iii.   Prudential has acted or refused to act on ground generally applicable to the Class, thereby rendering final injunctive relief or declaratory relief appropriate for the Class as a whole; and

iv.   Individual actions would unnecessarily burden the courts and waste judicial resources.

h.   **<u>Predominance</u>**: The questions of law or fact common to Class Members predominate over any questions affected only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**
**(Violations of the New Jersey Consumer Fraud Act**
**Under N.J. Stat. Ann. § 56:8-1, *Et Seq.*)**

98.   Plaintiff realleges and incorporates the proceeding paragraphs as though set forth herein.

99.   Plaintiff and the members of the Class are "persons" within the meaning of N.J.S.A. § 56:8-1(d).

100.     Defendants use and employ unconscionable commercial practices, deception, fraud, false pretense, false promises and misrepresentation, and knowingly conceal, suppress and omit to disclose material facts with the intent to cause Plaintiff to rely upon such concealment, suppression or omission, in connection with the deficient written notices practice and in connection with their subsequent performance of their obligations to Plaintiff, and have thereby violated N.J.S.A. § 56:8-19.

101.     Plaintiff and the other members of the Class have suffered an ascertainable loss of money as a result of said defendants' violation of the CFA, thereby entitling them to appropriate legal or equitable relief under N.J.S.A. § 56:8-19.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract Under Common Law)

102.     Plaintiff realleges and incorporates the proceeding paragraphs as though set forth herein.

103.     Plaintiff and the other members of the Class have suffered significant economic losses and will continue to suffer significant economic losses as a direct and proximate result of Prudential's breach of contract.

104.     In its contract, Prudential lists the Maintenance Fee as "[l]esser of $35 or 2% of the adjusted account value, but only if the unadjusted account value at the time the fee is due is less than $100,000" and reserves "the right to: (1) increase the maintenance fee, but it will not exceed $50 per annuity year, and (2) change the amount over which we will waive the maintenance fee."

105.    Prudential, however, siphons off the investment returns that it owes Plan participants or their beneficiaries, effectively charging a higher Maintenance Fee than scheduled in its original contract.

106.    The foregoing acts by Prudential were pursuant to a well-conceived pattern and practice and accompanied by a wanton and willful disregard of the rights of the of Plaintiff and the members of the Class. Prudential's misconduct, in light of its own previous violations and the insurance industry's recent settlements, demonstrate a reckless indifference to the consequences of its acts or omissions.

### THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Under Common Law)

107.    Plaintiff realleges and incorporates the proceeding paragraphs as though set forth herein.

108.    As the entity which was performing all of the decisions on whether to restrict Plaintiff and Class members' benefits, Prudential owed Plaintiff and the Class a fiduciary duty to properly perform such determinations.

109.    Prudential's breaches include but are not limited to:

a.  Prudential fails to distribute all benefits to lawful owners through a scheme of inadequate notice to and identification of living Plan participants and their beneficiaries to fairly and properly distribute pension benefits;

b. Prudential uses deficient and untimely notice and explanation of benefits, cash value options, and transfer options and deadlines in furtherance of this scheme;

c. Prudential fails to deposit unclaimed benefits into trust and unclaimed property accounts as required by law, instead releases those funds from Prudential's reserves to its proprietary accounts;

d. Prudential unjustly enriches itself in an amount equal to all profits obtained by Prudential on the borrowed benefits;

e. Prudential uses its SMEs, DARC, newly installed intricate software programs, and plan language experts to not only cover up its wrongdoing but also to craft language to perpetuate its ongoing accumulation of unclaimed benefits and their conversion.

110. Prudential's breach of fiduciary duty has caused substantial damages to Plaintiff and the Class in that their benefits have been reduced or denied.

## FOURTH CLAIM FOR RELIEF
### (Breach of Implied Duty of Good Faith and Fair Dealing Under Common Law)

111. Plaintiff realleges and incorporates the proceeding paragraphs as though set forth herein.

112. Implied in all contractual relationships between Plaintiff and Prudential was a covenant of good faith and fair dealing.

113. Prudential's breach of contract through its misconduct was wrongful and without justification.

114.    As a result of Prudential's actions, Plaintiff and the members of the Class have suffered damages.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment Under Common Law)

115.    Plaintiff realleges and incorporates the proceeding paragraphs as though set forth herein.

116.    At all relevant times, Prudential has consistently and systemically denied or reduced benefits for Plaintiff and Class members.

117.    Prudential unjustly enriches itself in an amount equal to all benefits that were not transferred to state unclaimed property accounts and the profit obtained by Prudential on the borrowed benefits.

## SIXTH CLAIM FOR RELIEF
### (Misrepresentation Under Common Law)

118.    Plaintiff realleges and incorporates the proceeding paragraphs as though set forth herein.

119.    Contrary to the representations made by Prudential that it would act like a fiduciary and comply with the law, Prudential's misconduct has denied or reduced benefits.

120.    Plaintiff and Class member's reliance on Prudential's misrepresentations, made as a seller of insurance and not as an administrator or fiduciary, was to their substantial detriment, as a result they have suffered or will suffer significant money damages.

121.    By virtue of the foregoing, Prudential has committed common law misrepresentations.

## **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully requests:

a.  a declaratory judgment and holding that the acts of Prudential described herein violate New Jersey's consumer protection laws and common law standards in the ways alleged and has been unjustly enriched thereby;

b.  that the case be certified to proceed as a class action pursuant to Fed. R. Civ. P. 23(a) and b(3), and that Stone and his attorneys be appointed to represent the Class as certified by the Court;

c.  a permanent injunction against Prudential, prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

d.  that the Court award Stone and the Class appropriate equitable relief to redress Prudential's violations of New Jersey's consumer protection laws, and common law, including disgorgement of the profits that Prudential reaped through the violations;

e.  that Stone and the Class recover prejudgment and post-judgement interest at the maximum rates permissible at law or in equity;

f.  that Stone and the Class recover attorney's fees, costs and other recoverable expense of litigation;

g.  that Stone and the Class recover such other and further relief that the Court

   deems appropriate and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a trial by jury for all issues so triable in this action.

Dated: New York, New York
      February 1, 2021

By: *s/ Roberto Cuan*
    John G. Balestriere*
    Roberto Cuan (Atty ID: 035821999)
    **BALESTRIERE FARIELLO**
    225 Broadway, 29th Floor
    New York, New York 10007
    Telephone:    (212) 374-5401
    Facsimile:      (212) 208-2633
    john.balestriere@balestrierefariello.com
    robert.cuan@balestrierefariello.com
    *Attorneys for Plaintiff and the Class*
    *Pro hac vice application forthcoming*